up 12%, to just over $52, their biggest one-day move in a decade. The tracker not only helped AT&T dodge that $3.6 billion bullet, but it also muzzled Wall Street's criticism of the cable strategy.

*   *   *

"*Wall Street's suspicion*," says Grubman, "*is that AT&T has been playing with the numbers to get the stock price up. In our report, we've laid out numbers that we didn't make up, so we obviously spent a lot of time talking to the company about them. If the numbers are real, the stock is huge. If they're fake, the stock will crash and burn....* Now that we have our reputation on the line, they'd better deliver, because if they thought we were harsh before, they haven't seen anything yet."

134.    On 1/7/00, AT&T filed a Registration Statement for the AT&T Wireless tracking stock offering. In 1/00, AT&T set 3/14/00 for a meeting of AT&T common shareholders to vote on amendments to AT&T's charter to create the AT&T Wireless tracking stock.

135.    On 1/11/00, Armstrong and other top AT&T executives met with financial analysts. They stated:

- *AT&T reaffirmed the Company's confidence in meeting its 00 financial targets.*

- *AT&T was also ahead of target in upgrading its cable facilities for two-way communications.*

- *AT&T's strategy for growth was on track as Armstrong and his team transformed AT&T from a domestic long-distance company to an any-distance, any-service global company.*

- Local residential sales continued at a brisk pace as *customers continued to embrace the bundled offer.*

- For 00, total revenue growth would range between 8%-9%, a 30%-60% increase from the revenue growth rate expected for 99, *excluding the impact of Concert*, the global joint venture with BT. Cash EPS for 00 was expected to range between $2.50 to $2.60, yielding reported EPS of $2.10-$2.15.

136.    On 1/25/00, AT&T reported its 4thQ 99 and 99 results and over the next few days its top executives (Armstrong, Sieglitz, Noski, Somers and Roscitt) had a conference call and other communications with top securities analysts. In these communications, AT&T's top executives reaffirmed the representations and forecasts they had made at the 12/6/99 analysts' conference. They also assured analysts that:

- AT&T was confident that its revenue growth was going to continue to accelerate.

- Strong pipeline and new General Motors and Acer contracts assure Business Services will grow at 9%-11% in 00.

•       After a deliberate pause in the 3rdQ 99, Wireless marketing was back to full strength. AT&T's Wireless unit was achieving strong subscriber growth with 440,000 net adds in the 4thQ 99 – its best 4thQ ever and its best December for net adds ever – allowing it to forecast 20%+ subscriber growth in 00.

•       While AT&T did not disclose its "churn" rate, its churn rates were generally in line with the industry and, on the digital side, a little better than the industry.

•       While AT&T had encountered slightly higher than anticipated broadband build-out costs, the broadband build-out was roughly on-track and on budget – with a unit cost slightly less than planned – proceeding a little ahead of schedule and successfully, with very strong consumer demand.

•       Business Services' revenue grew 8.5% in the 4thQ 99, *slightly* below the 9%-11% increase forecast for 00. *However, better sales execution and a strong pipeline of business due to new multi-year contracts, would enable Business Services to grow its revenue by 9%-11% during 00.*

•       AT&T was still forecasting 00 EPS of $2.10-$2.15, even though 1stQ 00 EPS would be slightly less than earlier forecast due to higher than anticipated wireless and cable upgrade costs.

137.    On 1/25/00, ABN AMRO issued a report on AT&T, which was based on and repeated information provided in the 1/25/00 conference call and in follow-up discussions with AT&T executives, and stated:

[M]anagement reaffirmed earnings guidance of $2.10-$2.15 for 2000 ....

*       *       *

Business Services

... Management expects growth in this segment to accelerate to 9-11% in 2000.

*       *       *

Q4 net adds totaled 440K, an increase over Q4 98.... T reaffirmed previous wireless guidance of 20% subscriber growth ....

138.    On 1/25/00, Salomon Smith Barney issued a report on AT&T, which was based on and repeated information provided in the 1/25/00 conference call and in follow-up discussions with AT&T executives, and stated:

AT&T's success in the cable modem rollout is extraordinary.

139.    On 1/26/00, PaineWebber issued a report on AT&T by Strumingher, which was based on and repeated information provided him in the 1/25/00 conference call and in follow-up

conversations with AT&T executives. The report forecast 00 and 01 EPS of $2.15 and $2.40, a 10% three- to five-year secular growth rate and stated:

> \*     Wireless continues to be the engine of AT&T's growth contributing two-thirds of pro forma revenue growth. Subscriber growth rebounded after a slow Q3 as AT&T spent much more heavily on customer acquisition.

*   *   *

### WIRELESS SERVICES

> Wireless continues to be the engine of AT&T's growth contributing two-thirds of pro forma revenue growth. Revenue growth was 42%, or 33% on a same store basis (adjusting for major acquisitions/diverstitures). ***Subscriber growth rebounded after a slow Q3 ....***

140.    On 1/26/00, Deutsche Banc Alex. Brown issued a report on AT&T, which was based on and repeated information provided at the 1/25/00 conference call and in follow-up discussions with AT&T executives and stated:

> \*     AT&T reiterated its EPS guidance for 2000 of $2.10-$2.15 ....

*   *   *

> With 1999 now behind AT&T ... we remain quite bullish on the story, as we believe AT&T enters the show with the broadest assortment of strategic assets, the strongest brand, and a management track record of fulfilling commitments. We believe the IPO of the company's wireless tracker will highlight even further the valuation potential for AT&T shareholders.

*   *   *

> AT&T reiterated its EPS guidance for the full year 2000 of $2.10-$2.15 ....

141.    On 1/26/00, PaineWebber issued a report on AT&T, which was based on and repeated information provided at the 1/25/00 conference call and in follow-up discussions with AT&T executives and stated:

> *On a pro forma basis, Business Services grew 8.5%, slightly below the 9-11% target for 2000. Better execution in sales and a strong pipeline in solutions given the recent multi-year contracts signed with General Motors, Detroit Automotive systems and Acer (the first non-U.S. based global deal), we believe an acceleration in revenue growth rate to 9-11% is achievable.*

142.    On 1/26/00, Warburg Dillon Read issued a report on AT&T, which was based on and repeated information provided at the 1/25/00 conference call and in follow-up discussions with AT&T executives and stated:

- 88 -

AT&T reaffirmed that guidance ... provided at its December analyst meeting was unchanged; guidance calls for 9-11% business services revenue growth ... and total pro forma revenue growth of 8-9%. Guidance for 2000 is ... EPS [of] $2.10-2.15 ....

143.    On 1/26/00, Jeffries & Co. issued a report on AT&T, which was based on and repeated information provided at the 1/25/00 conference call and in follow-up discussions with AT&T executives and stated:

Wireless and data services posted robust gains, and the Company appears to be poised for even greater growth in the year ahead, as it ramps up deployment of its broadband cable services nationwide. With strong growth prospects and a wireless tracking stock on the way, we believe these shares represent a compelling opportunity for investors in 2000.

                    *    *    *

In the Wireless division, AT&T added 440k new customers ....

                    *    *    *

With the Company outlining in greater detail its plans for its previously announced *tracking stock, we are of the belief that AT&T's share price performance will improve following the issuance and IPO....*

144.    On 1/26/00, Prudential issued a report on AT&T, which was based on and repeated information provided at the 1/25/00 conference call and in follow-up discussions with AT&T executives and stated:

*With the closure of Concert, the planned IPO of AT&T's wireless business and the expected close of the MediaOne merger this spring, we believe the pieces are all falling in place for an upward move in AT&T's stock price.*

145.    These statements made by AT&T in 1/00 and in connection with the release of its 4thQ 99 results about AT&T's Concert joint venture, AT&T's Business Services corporate long-distance segment and AT&T's accelerating revenue growth were false.

        (a)    As further detailed in ¶¶48-64, as part of AT&T's cost-cutting drive and the 10/99-11/99 reorganization of AT&T's Business Services operations, AT&T had eliminated or transferred numerous experienced multi-national corporate account representatives at the same time that it had transferred 300 major corporate customers to Concert and 1,200 very large corporate accounts internally to its "high growth" Business Services unit. *These transfers of AT&T's most important international corporate accounts, combined with the firing or reassignment of a large*

*number of corporate account representatives, was a disaster, immediately resulting in serious sales and customer service problems.* The lack of experienced account representatives and sales personnel caused important large corporate customers to be neglected and poorly served. Many large international corporate long-distance customers were enraged over these failures and by 12/1/99-1/1/00 told AT&T they would abandon or were abandoning AT&T's long-distance (voice and data transmission) business. These problems also resulted in a rapid erosion of AT&T's low-speed private-line business and a sharp slowdown in its wholesale voice revenues, which were dependent on this same customer base. These problems in AT&T's key Business Services unit were exacerbated by AT&T's loss during 99 of two large U.S. government long-distance contracts (the FTS 2000 contracts) and a huge ($650 million per year) BP Amoco PLC contract, which kicked in in late 99 and early 00, depriving AT&T of millions of dollars of previously in-place revenues. As a result of these negative factors, AT&T's competitive position was impaired and AT&T and Armstrong knew by 10/25/99 that AT&T's Business Services unit's revenues were being materially adversely affected, as AT&T had not successfully replaced the hundreds of millions of dollars in annual yearly revenues lost due to the FTS 2000 and BP Amoco contracts, and its Business Services revenues were being hurt by large international corporate customer defections. *Due to these negative factors, AT&T and Armstrong knew by 10/25/99 that the representations about the success of AT&T's Concert joint venture and its business long-distance service and the accelerating revenue growth of AT&T's Business Services division were false.* Also, by late 1/00 or early 2/00, AT&T's Business Services corporate long-distance operations had deteriorated so seriously that AT&T was in the process of *replacing several of the top managers in that Business Services unit in an effort to correct the problems being encountered there – which were resulting in the loss of significant numbers of important corporate customers.* And the reason for the slight shortfall in revenue growth in AT&T's Business Services unit during the 1stQ 00 was the undisclosed debacle in AT&T's Business Services unit – *not* higher than anticipated wireless and cable upgrade costs as reported.

    (b)  The subscriber growth rate and "net adds" of the AT&T Wireless unit was overstated, as managers in the AT&T Wireless unit were causing sales executives to create phony Wireless accounts to inflate the number of new subscribers by way of the "TOA" scam, as detailed

in ¶¶85-91. Due to poor service, billing mistakes and inferior technology, AT&T Wireless was encountering excessive "churn," *i.e.*, customers who quit, which greatly increased the net cost of obtaining new subscribers, which was adversely impacting AT&T's results.

(c)     The statements about the cable upgrade/broadband build-out project were false and misleading because AT&T's cable upgrade/broadband build-out was significantly behind schedule and over budget due to the technical difficulties and other problems being encountered, as detailed in ¶¶65-68. AT&T was experiencing several severe problems with the installation/conversion of its cable lines to make them suitable for voice phone calls. By late 99, there was a severe shortage of qualified technicians to perform the conversion. The technology required that they be computer, software, telephone and digital technicians. Not only was there a shortage of qualified workers, but the rapidly changing face of the cable industry required workers to retool continually and costs had escalated far beyond AT&T's initial forecasts, resulting in a larger upgrade cost per household not a lower cost per household. The development of the cable network was resulting in accidents where AT&T technicians would rupture other utility lines, delaying installation, creating liability to AT&T and further increasing costs.

(d)     The statements about AT&T's success in delivering bundled telecommunications services were false and misleading because AT&T's attempt to deliver bundled services of cable, TV, Internet access, long-distance and local telephone and wireless services to customers was failing and could not be achieved due to AT&T's inability to successfully integrate the acquisitions it had made over the prior few years and its inability to efficiently and effectively deliver bundled services to customers, as detailed in ¶¶69-84.

(e)     These statements were also false and misleading due to the failure to disclose that AT&T's top executive team was planning to break-up AT&T into three or four separate companies after the AT&T Wireless tracking stock IPO was completed, as described in ¶94.

146.     On 3/14/00, AT&T held a shareholder meeting and AT&T's shareholders followed the recommendation of AT&T's Board to authorize the issuance of this new class of AT&T stock so that the IPO of that stock could go forward. By 3/29/00, AT&T stock traded at $61, *still above the critical MediaOne $57 per share guarantee level* which would enable AT&T to save $3.6 billion if it could

- 91 -

keep its stock above $57 and was able to close the MediaOne transaction in the near future. During the first three weeks of 4/00, AT&T's top executives went on an extensive "Roadshow" to create investor enthusiasm for and interest in the IPO of AT&T's Wireless tracking stock, during which they continued to conceal the serious problems in AT&T's Business Services unit and that AT&T's recent forecasts of accelerating revenue growth were false and would not be achieved.

147.   On 3/29/00, AT&T executives held a conference call with analysts. During the call AT&T executives discussed AT&T's cable upgrade/broadband build-out. Analyst then reported this information:

• On 3/29/00, Salomon Smith Barney issued a report on AT&T by Grubman, which was based on and repeated information provided him in the 3/29/00 conference call. It stated:

To be candid, we found the most interesting information on today's call was AT&T's response to [a] question regarding the rollout of cable modem and residential telephony services. Which was that they were currently proceeding at rates of approximately 2,000 cable modems (double 4Q99 levels) and 500-600 residential telephony installs (up from an average of 70 in 4Q99) per day – a clip that suggests AT&T is successfully ramping up its broadband products.

• On 3/29/00, Thomas Weisel Partners issued a report on AT&T by Linnehan, which was based on and repeated information provided in the 3/29/00 conference call. It stated:

* Importantly, AT&T reaffirmed that it is on or ahead of schedule in terms of rolling out its high-speed data, digital TV and cable telephony product and is also on or ahead of schedule (and budget) in upgrading its network.

* * *

*AT&T is at or ahead of target in data, cable telephony, and digital video – Even before this announcement, AT&T was meeting or beating its plans for the rollout of these services and was on schedule and budget for upgrading the cable network.*

148.   On or about 3/31/00, AT&T issued its 99 Annual Report to Shareholders. The report began by stating "now we're delivering results," "we're creating a new AT&T to bring a new generation of communications and information services to people's homes and businesses," and included a letter signed by Armstrong that stated:

*AT&T is successfully transforming itself from a domestic long distance company to an any-distance, any-service global company.*

*That was the promise of my last annual report to you, and I'm proud to report that we are delivering on that promise.*

*We've made the right strategic decisions, invested in the right assets and have the right people to get the job done.*

In 1999 ... [w]e began operation of Concert, our joint venture with BT, to better serve multinational corporations around the world.

\* \* \*

*We also upgraded more than half our cable plant – just as we said we would – and at a slightly lower cost per household than we originally estimated.*

\* \* \*

The people of AT&T are demonstrating that our strategy is not just doable – it's being done.

Employees at every level throughout our business are committed to meeting our ambitious goals. They've got the knowledge and the skills to make it happen. They're energized about the transformation of our company. And as you'll see in the next few pages, that transformation is well under way.

\* \* \*

*AT&T is gaining momentum. Our strategy for growth has us on the right track. Our record of meeting commitments is quickening our pace. My millennium message: There's no stopping us.*

149.   Elsewhere, the 99 Annual Report stated "*AT&T Wireless Services is our fastest growing business, with a 33 percent increase in subscribers,*" "*AT&T Broadband is on track and gaining momentum,*" and "*[w]e're upgrading the broadband cable assets we acquired for two-way communication. That upgrade is ahead of schedule and on budget, and the installation trucks are right behind, rolling out new services like any-distance telephony, high-speed Internet access and digital video.*"

150.   Elsewhere, AT&T's 99 Annual Report stated:

In 1999, we made significant strides to transform AT&T and deliver growth. We finalized many of the strategic acquisitions we announced in 1998 and made additional investments to further support our facilities-based growth strategy. We continued to maintain the execution-focused culture of the new AT&T.

\* \* \*

As we worked to grow our wireless businesses in 1999, we also started putting the bricks and mortar around our broadband plans – a key component of our overall growth strategy. We completed our $52 billion merger with Tele-Communications, Inc. (TCI) in March, and *quickly accelerated the upgrade of the TCI cable plant*, which will enable us to develop additional revenue streams from any-distance cable telephony, high-speed data, and digital video....

In addition to the accomplishments in our domestic growth initiatives, *we also made significant progress in our global strategy. Most notably, we launched Concert – a leading global telecommunications company created through AT&T's joint venture with British Telecommunications plc (BT).* Concert represents the core of our global strategy and began serving multinational business customers, international carriers and Internet service providers in January 2000.

*      *      *

We've come a long way in 1999.... *[W]e've made solid progress in our strategy to transform AT&T*, and we've delivered on our commitments for growth and expense control.

151.   In discussing AT&T Wireless, the AT&T 99 Annual Report stated:

*Consolidated subscribers grew 33.4% to approximately 9.6 million at December 31, 1999.*

The 99 Annual Report also contained the following graph:



152.   With respect to the AT&T broadband build-out, the 99 Annual Report stated:

*Broadband's telephony pilot market initiatives are progressing on schedule.*

153.    The statements in AT&T's Annual Report were false and misleading for the reasons stated in ¶¶132, 145.

154.    On 4/3/00, AT&T issued a release on AT&T which was headlined and stated:

AT&T Provides Guidance On AT&T Wireless Group's Mobility Unit

... AT&T today issued selected estimated first quarter financial information for the AT&T Wireless Group mobility unit as the company begins a series of investor presentations relating to the upcoming initial public offering of the AT&T Wireless Group.

AT&T said that the AT&T Wireless Group mobility unit is expected to report first quarter revenue exceeding approximately $2.1 billion. *Net wireless subscriber additions are expected to exceed 400,000 for the first quarter.*

That statement was false and misleading as the new subscriber number was inflated due to the TOA scam described at ¶¶85-91.

155.    During 4/00, the U.S. securities markets became very volatile and suffered significant declines – especially in "high-tech" stocks. By mid-4/00, many IPOs had been canceled. However, AT&T was determined to complete the huge IPO of its Wireless tracking stock because its top executives knew they could not conceal much longer that AT&T's 1stQ 00 results would be disappointing due to the serious problems in AT&T's Business Services unit. These unsettled market conditions made it even more imperative that AT&T assure investors of the basic health and success of its core business – especially its Business Services corporate long-distance operations – so that AT&T common stock would hold up well during this critical period when AT&T attempted to complete the largest IPO in history and was trying to get the MediaOne acquisition closed.

156.    Due to AT&T's sophisticated and highly automated financial and accounting controls and reporting systems, AT&T knows its quarterly results (subject to non-recurring adjustments) within 24-48 hours after the end of the quarter and is able to calculate and release its quarterly results in 14 business days after the calendar end of the quarter in question. With respect to AT&T's 1stQ 00, AT&T completed the "quarter close" and was prepared to release its financial results by 4/18-19/00, at which time it would normally have reported its 1stQ 00 financial results and had extensive discussions with analysts regarding those results, as well as the overall condition of and trends in AT&T's business. However, AT&T's top executives knew that as a result of the debacle in AT&T's

- 95 -

core corporate long-distance segment, *i.e.*, Business Services, AT&T was going to report much slower than previously forecast revenue growth for that segment in the 1stQ 00 and would have to reveal that this meant that AT&T was going to have to lower its *business long-distance growth rate and its overall corporate growth rate after it had just raised both of those significantly at the 12/6/99 analysts' meeting*! AT&T's top executives also knew that disclosing this negative information at the time that AT&T was attempting to complete the IPO of its Wireless tracking stock amid tumultuous market conditions would likely result in a precipitous decline in AT&T's stock price. At a minimum, this would cut the offering price of the 360 million shares of the Wireless tracking stock to be sold in the IPO by several dollars per share, if not result in the cancellation of the IPO at that time. *Thus, even though AT&T's 1stQ 00 results were known to AT&T's top executives by 4/1/00 and completed and ready for public release by 4/18-19/00, AT&T's top executives deliberately delayed the release of those results to conceal AT&T's poor 1stQ 00 results and the adverse information which they knew would accompany those 1stQ 00 results so that AT&T could complete the important Wireless tracking stock IPO before this negative information became public*!

157.    In order to ensure the success of this unprecedented IPO (the largest in history) – a task that was all the more daunting in light of the 4/00 downturn in the IPO market – AT&T engaged in an all-out publicity blitz, including an extensive "Roadshow" during which top AT&T executives met with and/or called major institutional investors to stimulate interest in the AT&T Wireless IPO, so that there would be strong demand for the stock on the IPO, enabling AT&T to sell the Wireless tracking shares at a higher price, generating more net proceeds. During the first three weeks of 4/00, AT&T's top executives went on an extensive "Roadshow" to create investor enthusiasm for and interest in the Wireless tracking stock IPO, during which they continued to misrepresent and overstate the rate of Wireless new subscriber growth while concealing the TOA activity, as well as the serious problems in AT&T's Business Services unit and that AT&T's recent forecasts of accelerating revenue growth were false and would not be achieved. AT&T's Roadshow efforts included 72 one-on-one meetings with institutional investors in 26 cities, 24 group gatherings and five conference calls. During these communications, AT&T executives did not disclose the adverse facts and conditions concerning

- 96 -

AT&T's business, which were then adversely impacting AT&T's business, as detailed at ¶¶132 and 145, or that AT&T's 1stQ 00 results had been disappointing and below expectations.

158.    AT&T's promotional/informational efforts for the Wireless IPO also included the release, on 4/24/00 – just three days before the IPO – of positive 1stQ 00 financial data for AT&T's Wireless unit.  AT&T's 4/24/00 release stated:  *"Net subscriber additions totaled 418,000 as compared to 372,000 in the first quarter of 1999. Revenue growth was driven by this increase in the number of subscribers, as well as by subscribers' increased use of wireless services."*  That statement was false and misleading as the new subscriber number was inflated due to the TOA scheme described at ¶¶85-91.

159.    On 4/26/00, AT&T successfully completed the IPO of its Wireless tracking stock – the largest IPO in history – selling 360 million shares at $29.50 per share, raising $10.6 billion in needed capital for AT&T and its Wireless business. On 5/2/00, the AT&T Wireless tracking stock IPO closed and AT&T received $10.6 billion. *The same day*, 5/2/00, AT&T released the disappointing 1stQ 00 results – which it had been concealing for several days while waiting for the Wireless tracking stock IPO to be completed at the most favorable price obtainable under the circumstances. AT&T shocked investors and the securities markets by revealing that due to the serious problems in AT&T's business long-distance voice and data transmission operations – and its Concert joint venture – several significant corporate long-distance customers had indicated they were going to terminate or had terminated their long-distance service with AT&T. This, combined with the huge amounts of lost revenues due to the lost FTS 2000 and BP Amoco contracts, meant that AT&T's vitally important core business long-distance voice and data transmission operations would not achieve the growth that had been forecast by AT&T since the 12/6/99 analysts' meeting and that, as a result, AT&T's overall growth rate also had to be reduced. In fact, throughout the Class Period the truth was that the growth in AT&T's core business long-distance operations had been slowing dramatically, a situation exacerbated by the disastrous reorganization and re-alignment of AT&T's business long-distance operations in 10/99-11/99, together with the adverse revenue impact of AT&T's loss of the huge FTS 2000 and BP Amoco long-distance contracts earlier in 99.

- 97 -

160.    AT&T's 1stQ 00 results were publicly announced on 5/2/00 – *21 working days after the close of the 1stQ 00, i.e., 3/31/00*! That was the largest number of working days past the close of a 1stQ that AT&T took to report its 1stQ results in at least 10 years! The average number of days required for completion and release of AT&T's 1stQ results over the past 10 years has been 13.4 days, *i.e.*, here 4/18-19/00. The table below shows the number of working days that passed between quarter end and the release of AT&T's 1stQ results for each 1stQ since 12/31/90:

| First Quarter Ended | Date Earnings Received | Working Days Since Quarter End* |
|---|---|---|
| 03/31/00 | 05/02/00 | 21 |
| 03/31/99 | 04/27/99 | 18 |
| 03/31/98 | 04/20/98 | 13 |
| 03/31/97 | 04/21/97 | 15 |
| 03/31/96 | 04/17/96 | 12 |
| 03/31/95 | 04/19/95 | 12 |
| 03/31/94 | 04/20/94 | 13 |
| 03/31/93 | 04/21/93 | 14 |
| 03/31/92 | 04/15/92 | 11 |
| 03/31/91 | 04/17/91 | 13 |

*   Number of working days between quarter end and press release, not including quarter-end date.

*AT&T's top executives deliberately concealed and delayed the release of AT&T's 1stQ results until 5/2/00, so AT&T could pull off and close the huge IPO of its Wireless tracking stock and in the hope that it could keep AT&T stock trading at $57 or above until closing the MediaOne acquisition.*

161.    AT&T was successful in one part of its scheme – it was able to complete the IPO of 360 million shares of AT&T's Wireless tracking stock at $29.50 per share raising $10.6 billion, compared to the $24.50 per share AT&T Wireless tracking stock fell to after AT&T revealed the adverse information about its core business long-distance operations and AT&T's growth on 5/2/00. However, AT&T was not successful with respect to the other part of its scheme as it could not get the MediaOne acquisition closed prior to the 5/2/00 revelation of that adverse information. Thus, because

of the collapse of AT&T's stock to as low as $35-1/2 per share, AT&T had to pay the $3.6 billion cash guarantee on the MediaOne acquisition when it closed in early 6/00.

162.    During AT&T's 5/2/00 conference call, Roscitt, the head of AT&T's Business Services unit, admitted that in 2/00 – long before any disclosure of problems in AT&T's Business Services unit – AT&T was engaged in a significant internal restructuring of that unit, including replacing several top managers, to try to overcome the problems which had arisen there. According to Roscitt, AT&T had shuffled too many people too fast across accounts, had broken relationships and was re-deploying people back into sales where they had been before as fast as it could and was hiring 600 additional people for this unit as fast as it could. Roscitt said:

> The high end of the business marketplace showed slow growth very late in the fourth quarter and therefore we started 2000 with a lower jump of 12 points than we had anticipated.... [S]ome of that is attributable to large customers slowing down their private networks for Y2K or related intervention, frankly, the mid-1999 reconfiguration of our high-end sales channel had more impact than we anticipated for several reasons....[W]e realigned the high-end sales team to put a much more – more of an emphasis on data over the voice business further causing a resource realignment as I said that was larger than anticipated. But we quickly recognized these problems .... The second challenge we faced was something that was an event earlier in history, in early 1999 we announced that we had lost the FTS 2000 government contract. And, while that happened as an event in early '99, the revenue impact as that is being implemented will spread throughout sequential quarters in the full year 2000, so we have a negative growth rate there.

*   *   *

> In February 2000, we went through a fairly significant restructure of the AT&T business services organization to refocus the management model and to react to some of the situations I outlined and frankly to put more accountability in individual leaders' hands. We now have a data and IP business that's combined under one leadership entity with Kathleen Early leading, [and] we've overhauled the entire failed leadership team and establish[ed] an overall head of AT&T business services sales ....

*   *   *

> Yeah, Frank, that is exactly what we intend to do – you heard it well. We are going to take the high end of the marketplace and, frankly, revitalize it ... Ken Fishow – he will now lead all of AT&T's business services. Sales has been in place since mid-February. Doing that has made significant changes already in the leadership team .... We think we already are starting to see some impact from that, but it is a large market and will take some time. In terms of hiring we are adding something in the range of 600 additional data and IP skilled people as fast as we can hire and deploy, and we are deploying staff people without replacement from our headquarter's location into field sales, people primarily who had been in sales before, who are reassigning back to sales marketplace.

*   *   *

*It's not an industry issue, we really shuffled too many people too fast across accounts, broke a few relationships* and, frankly ... did not have our eyes squarely focused on it. We changed out that leadership team in a pretty dramatic way.... So, it's ... not a particular industry, it is a set of accounts where we, frankly, did not pay enough attention to the high-end and didn't have enough management focus on it.

163.   According to *The Wall Street Journal*, AT&T's 5/2/00 conference call explaining this debacle "*left many analysts dismayed*," as Armstrong admitted, "*I do wish that the forecasts we made ... had been more accurate*." Analysts were furious over this deception by AT&T. One wrote, "*This was a weak quarter, and fundamentals will remain weak ....*" Another said, "*This is a major disappointment versus management's repeated claims ... of being a high-growth company ....*" Another stated, "*We are downgrading shares of T [on] ... lower-than-expected near-term value recognition from the Wireless Group IPO .... After successive downward revisions to growth expectations in Business Services ... the operational challenges that AT&T faces in making the change from a cost cutting story to a revenue growth story are more daunting than we had originally expected and could get worse before they get better*." Another wrote, "*The violent reaction in the stock was probably a function of both new information and surprise timing. Since AT&T provided detailed 2000 financial guidance in December 1999, a shortfall in the first three months of 2000 was unsettling*."

164.   Analysts and investors reacted to this shocking news with a vengeance. AT&T's stock – one of the largest capitalized stocks in the world – collapsed, falling from $48-13/16 on 5/1/00 to $41-1/8 on 5/2/00 – a 16% decline on astonishing volume of 64.75 million shares, *the largest one-day volume in AT&T's history as a publicly traded company*! AT&T stock continued to fall to $35-1/2 as investors digested the full impact of these very negative revelations. As a result, AT&T's stock, which traded as high as $61 on 3/29/00, fell to as low as $35-1/2 on 5/11/00 – *a staggering wipeout of $80 billion in shareholder market capitalization in just one month, and continued to fall to as low as $22, its lowest level in years, as AT&T's business problems not only persisted but got worse and Armstrong finally persuaded the Board to "break up" AT&T into four separate companies – a maneuver designed to attempt to disguise a huge dividend cut.* AT&T Wireless tracking stock, which had been sold to the public on 4/26/00 at $29.50 per share, also collapsed, falling to as low as $18-1/16 per share.

- 100 -

165.   On 5/4/00, *The Wall Street Journal* stated: "AT&T's disclosures have angered many analysts and investors, who complain the company knew about these problems for months but didn't make them public. Some note that the disclosures came only after AT&T's initial public offering of its wireless business."   Analyst Jana Harris, employed at a pension fund whose largest holding is AT&T, as reported in a *Bloomberg News* article issue on 5/2/00, "questioned the timing of the warning":

> "I wonder why they didn't make us aware of the problems they were having before now. My strong gut feeling is they wanted the wireless offering to go off well," Harris said. "A lot of people feel misguided or somewhat deceived."

According to *The New York Times*:

> [T]he manner and timing of the May 2 announcement *left a bad taste for many investors and analysts.*

> Just three business days before AT&T delivered its bad news, the new stock meant to track the company's wireless business, whose offering brought AT&T a $10.6 billion windfall, began trading.

> *In the days and weeks leading up to the offering, AT&T executives led by John D. Zeglis, AT&T's president, had crisscrossed the country touting the new wireless shares to investors.  And in the course of those discussions, it does not appear that Mr. Zeglis gave even a hint of the problems that AT&T was about to announce, leading some investors to worry that perhaps they had been manipulated.*

> "Some people said: 'Hey, I just met with Zeglis. What's that about?'" said one communications analyst, on condition of anonymity.   Had AT&T delayed the announcement of the bad news to avoid tainting the wireless offering, whose ticker symbol is AWE?  What would that say about AT&T's communications in the future?

Importantly, Armstrong did not deny concealing this adverse information, rather he said only:

> *"We didn't think it was relevant to the AWE offering ...."*

166.   On 5/4/00, *The Wall Street Journal* reported:

**AT&T's Business Unit Admits Mistakes**

\* \* \*

> The head of AT&T Corp.'s giant Business Services unit acknowledged a series of mistakes ....

> "There are some issues that, frankly, we could have and should have performed better on," said Rick Roscitt, a 48-year-old AT&T veteran who is the third president of AT&T Business Services in the past 15 months.

> As the biggest single unit within AT&T, Business Services is emerging as ground zero for mounting concern about the company's prospects, particularly because

AT&T Chairman C. Michael Armstrong has targeted the unit for aggressive growth. Tuesday, AT&T lowered its revenue growth target for business services to 8% from the earlier 9% to 11% for the year.

*This may not sound like a big change, but many analysts were caught off guard by a slew of problems at the unit because much of the rest of the telecommunications industry is enjoying double-digit growth in sales of data, Internet and voice to corporate clients....*

*AT&T's disclosures have angered many analysts and investors, who complain the company knew about these problems for months but didn't make them public. Some note that the disclosures came only after AT&T's initial public offering of its wireless business....*

At least some of those problems occurred when AT&T transferred 300 top-ranking corporate clients to AT&T's joint venture with British Telecommunications PLC, called Concert, late last year, and lost some customers in the process. The transfer occurred as AT&T was making job cuts among its account representatives, and shifting 1,200 big global accounts to what it calls its "growth unit," where companies no longer have their own representatives.

This lay the groundwork for losing some big clients, said company officials. *"We couldn't really cover them. We had account managers spread too thin," said AT&T's Mr. Roscitt. "We woke up and realized that we disrupted more relationships than we cared to."*

\* \* \*

AT&T suffered another blow last year when it lost a crucial government contract to MCI WorldCom Inc. The contract, called FTS 2000, is so big that MCI WorldCom is counting on it bringing in $750 million in revenue over the next four years. MCI WorldCom also snagged a big AT&T customer last year, BP Amoco PLC, for a multiyear contract for at least $650 million.

*... [O]n the whole, there is a sense that the unit isn't keeping up with the overall growth in the industry, especially as data and Internet use explodes and competition increases from many quarters.*

... Eric Strumingher, an analyst at PaineWebber Inc. who also downgraded AT&T yesterday ... said AT&T rivals are enjoying data growth of more than 30%, while AT&T's data and Internet growth remains in the midteens. *"This is not an industry issue; this is an AT&T-specific issue,"* he said.

167.   According to the 5/29/00 edition of *Fortune*, in an article entitled "More Not-So-Good-News for AT&T":

The Company recently pared back growth estimates of the business services unit to 8% this year, down from earlier forecasts of 9% to 11%, and lowered 2000 earnings estimates for the entire company. Wall Street slammed the stock accordingly, sending it down 26%.

A spokeswoman [for] the company ... blamed the woes in the business segment on AT&T's failure to serve some of its biggest customers. When AT&T transferred its biggest multinational accounts to Concert, its joint venture with British Telecom,

account reps didn't know which entity the customers belonged to. The result: Customers were confused and inked future contracts with others. These corporate accounts matter – about half the company's revenues and top-line earnings come from corporate sales.

168.   On 10/2/00, *The Industry Standard* reported:

One of Armstrong's first moves was to shed thousands of employees – always a quick and dirty way to please Wall Street. But those losses, coupled with the hundreds of salespeople who left AT&T to join the Concert joint venture with BT, left the company with gutted, underperforming service and sales groups. Customers fled, and projections were revised for the business services group; the whole company had to restate its estimates. *"We're still suffering from the shortfall," says [John Petrillo, AT&T's VP of Strategy and Development]. "But we've been chastened and we're remorseful about it."*

169.   According to the 9/00 edition of *Bloomberg Markets*:

On May 2, three business days after AT&T Wireless went public, Armstrong informed analysts that AT&T's annual earnings would be lower because revenues from long distance were deteriorating faster than he had anticipated. He said the decline in the consumer long-distance business would be 5-7 percent instead of 3-5 percent. He explained that new revenues from his huge investments weren't kicking in as fast as he'd expected to make up the difference. Says CFO Noski, who joined the company after the projections had been made, *"I think the planning and forecasting process last year may not have been as rigorous as it might have been."*

Armstrong lowered estimates for business services growth .... He admitted AT&T had mismanaged some major business accounts in its Concert joint venture with British Telecom. In the shuffle, competitors like WorldCom and Sprint snapped up some of AT&T's biggest accounts. AT&T lost a $650-million contract for BP Amoco and a government contract worth $3 billion to WorldCom.

170.   *Roscitt has admitted to the media that he "knew" that the Business Services unit's revised and increased growth rates announced in 12/99 were false when he saw the 1/00 results –* of which he "quickly" informed Armstrong. *However, he and Armstrong decided not to disclose this information then, but rather, to conceal it while waiting for the 2/00 and 3/00 results which, as they knew they would be, were even worse.* Thus they made no disclosure, waiting to complete the AT&T Wireless offering. Armstrong has reportedly stated:

*"Where the problem happened, I'm accountable, but I don't operate quite at that level,"* Mr. Armstrong said. *"The relationships, the administrative support, the skill coverage in those accounts was not carefully managed and we lost the kind of proposing, anticipating and customer-relationship role. And we've got to redo that. And you don't do that in weeks or months. It's going to take quarters."*

171.   The undisclosed problems afflicting AT&T's business during the Class Period were serious and pervasive and since the revelations of 5/2/00, they have worsened so seriously that on

- 103 -

10/25/00, AT&T announced it was cutting its forecasted 00 EPS to $1.66 due to Business Services' poor performance -- very weak revenue growth (2.5%) which would continue during 01 resulting in falling earnings for this key segment. As a result, Armstrong announced that AT&T was reversing course and, after he had caused AT&T to incur $62 billion in debt to acquire other companies so AT&T could deliver bundled services, AT&T was breaking itself up into four separate companies. *However, this split-up was, in fact, an admission that the Armstrong-led revival of AT&T was an utter failure and was, in fact, a thinly disguised step to substantially cut, if not eliminate, AT&T's common stock dividend of $.88 -- the final humiliation of Armstrong and insult to AT&T's public shareholders.* The press reported:

- *The Wall Street Journal*-10/26/00:

  *The company ... disclosed ... that the "systemic decline" of ... business customers, the core of the company, is steeper than previously thought.*

  *   *   *

  AT&T said that for the first time ever it will cut its dividend, with the combined payout for all four of the new units winding up "substantially less" than AT&T's current annual dividend of 88 cents a share....

  *People familiar with the matter say the dividend will be slashed by more than half its current level.*

  *   *   *

  "*It's hard to escape the feeling that a corporate funeral took place today,*" said Ken McGee, an analyst with Gartner Group. "It's really the end of an icon *and no matter how they try to put a positive spin on it, it's the death of [a] corporate giant.*"

  Investors concurred. They ignored AT&T's claims that AT&T's pieces are worth far more than the stock market is valuing the company. Wall Street focused on the poor revenue report, sending the stock down 13% to $23.37, down $3.50 a share ....

  *   *   *

  Mr. Armstrong said he and Chuck Noski, AT&T's chief financial officer, began talking about a breakup about nine months ago .... "We started talking about it in February or March and we brought it to the board in April. Our work evolved through the summer."

  *   *   *

  [Armstrong claimed the break-up was part of his ongoing plan] *[b]ut nobody was buying that view this time around*, especially Wall Street and AT&T's once-loyal

investors. And many observers speculated that Mr. Armstrong and his lieutenants won't be around to see his latest plan completed.

"What the market said today is that Armstrong's strategy in any form whatsoever − even breaking up the company − continues to be a failure. And the market voted with its feet" today by driving down AT&T shares, said Brian Bruce, director of global investments for PanAgora Asset Management Inc. in Boston, which has held AT&T shares.

*"Today's announcement is simply window dressing" and yet another example of how Mr. Armstrong "continues to be incredibly ineffective,"* he said.

- *The New York Times*-10/26/00:

If only AT&T worked as hard at telecommunications as it does at financial engineering, maybe investors would treat it with more respect. *The newest breakup of AT&T is a desperate effort to make Wall Street happy, something the company seems to think it can accomplish by dishing out lots of investment banking fees while reducing dividends paid to its shareholders.*

- *Los Angeles Times* − 10/26/00:

*In a dramatic signal that AT&T's three-year effort to remake itself into a one-stop telecommunications marketplace has failed, the company said Wednesday it will disassemble itself into three separate companies ....*

\* \* \*

Armstrong's master plan was to turn Ma Bell into an integrated provider of local, long-distance and wireless phone calling, along with cable television and Internet services. Over the next two years he spent about $100 billion to buy two huge nationwide cable systems to carry most of those services into the home.

\* \* \*

*"Frankly, if AT&T was performing up to its original forecasts ... talk about restructuring would not exist,"* said Jack Grubman, analyst at Salomon Smith Barney.

Sales growth in AT&T's business services segment is projected to be half of what was originally anticipated ....

\* \* \*

*"This is an amazing strategic about-face for AT&T,"* said one prominent industry observer.

- *The Industry Standard* − 11/6/00:

*For those who enjoy watching monoliths disintegrate, AT&T's crack-up has been a gratifying spectacle.*

Last week CEO Michael Armstrong, who took over the telecommunications giant in 1997 determined to build a single shop for voice, data and multimedia transmissions, announced that the company would split into four separate companies ....

- 105 -

\* \* \*

*Indeed, the breakup represents a comeuppance for Armstrong, whose dream of creating the reigning communications conglomerate – a sort of GE of the telecommunications industry, providing voice and data transmission over a vast unified network – is now officially dead....*

The AT&T name will reside with AT&T Business Services, which offers Internet hosting and data networking to corporate customers. Though lucrative (it generated $25 billion in revenue in 1999), *that business has suffered from the effects of layoffs among its sales staff, mandated shortly after Armstrong took over the company.*

- *Business Week* – 11/6/00:

The restructuring is no magic bullet. And it's unlikely that execs who have been missing their financial targets as part of AT&T will suddenly become capable of hitting them now that they're on their own.... Salomon Smith Barney analyst Jack B. Grubman downgraded AT&T's stock ..., his second downgrade of the year. "*The business is melting down,*" says Grubman.

*Armstrong is under tremendous pressure to fix AT&T's flagging stock price. The company's shares have tumbled 62% from their peak last year, to $24, and are trading at 20% less than when Armstrong was hired three years ago.*

\* \* \*

The operation that sells to businesses has its work cut out for it. After bungling the sales force reorganization earlier this year, the business has a lot to prove.

- *Newsweek* – 11/6/00:

As you doubtless know, AT&T unveiled a complex plan last week to turn itself into three separate companies with four parts sporting a total of six different stocks. What you may not know is that a major motivation was AT&T's worry that its falling stock price made it vulnerable to a hostile takeover....

The biggest winners in AT&T's proposed breakup, dubbed Project Grand Slam, are investment bankers, lawyers and other parasites, who stand to reap World Series-class fees. The losers are those who depend on AT&T's formerly reliable dividend for income. AT&T's dividend had never been cut since the company started paying it in 1881, a period that includes several financial panics, two world wars and the Great Depression.... AT&T ... can't keep shelling out $3.3 billion of dividends a year....

The Street reacted by knocking 19 percent off AT&T's already depressed share price in two days. That decline probably has more to do with the warning AT&T issued Wednesday – it said revenues and profits for the next 15 months will be lower than forecast – than with the breakup and dividend cut. But it shows how far Armstrong's Street cred[ibility] has dropped. Back in March, when Wall Street considered Armstrong a visionary genius, news of AT&T's shuffling stocks around would have sent the stock to the moon. *Witness the 25 percent, four-day rise last November, when news leaked that AT&T might issue a "tracking stock" tied to its wireless business. But Armstrong was a hero then; now, he's a bum.*

- *Business Week – 2/5/01:*

Armstrong's efforts to buy his way out of the mess by acquiring cable giants Tele-Communications Inc. and MediaOne Group have saddled this company with an alarming $62 billion in debt....

In a desperate attempt to rescue AT&T, Armstrong announced on Oct. 26 that he would break the 123-year old flagship of the American telecom industry into four pieces.... But investors and analysts balked. The company's stock was whacked 18%, falling to 23% the day the restructuring was announced. And it ended 2000 down 66%, at 17-1/4 ....

... Now, Armstrong is making his last stand.... But his ambitious attempt to restore Ma Bell to her former glory by making it the most important communications company of the Digital Age lies in tatters. If he can't make the breakup a success, he risks being remembered as the man who oversaw the demise of an American icon.

* * *

*And Business Week has learned that the company has run into substantial trouble in developing new cable-technology equipment. The result is that the cost of signing up customers for local telephone service over the cable network will continue to be $600 per home for another year or two instead of dropping to $400 per home in 2001, as Armstrong had promised investors. AT&T confirmed the delay.*

* * *

The two units that provide long distance have problems beyond evaporating revenues. *AT&T Business, which gets more than half of its $29 billion in sales from long distance, lost corporate customers in late 1999 because of a chaotic sales-force reorganization.*

* * *

The tale of how Armstrong started down this path begins further back than most would suspect. *It was in November, 1999, that he first considered busting up the company....* Armstrong had spent the previous two years trying to rebuild AT&T into a juggernaut that could supply soup-to-nuts communications services. His $105 billion in cable acquisitions were designed to allow him to sell consumers high-speed Net access and local telephone service over the cable-television network, along with AT&T's existing long-distance, wireless, and data services for corporations.

* * *

Grand Slam was a strikeout. *Many investors felt Armstrong was conceding that his acquisition spree was a bust. "Clearly, this is a complete reversal of strategy," says telecom analyst Adam Quinton of Merrill Lynch & Co.*

* * *

Brian Hayward, manager of the $2.4 Invesco Telecommunications Fund, sold his remaining shares in AT&T after Armstrong announced Grand Slam.... "They've been telling us up until now that bundled service is the way of the industry, and now they're

telling us these companies are ready to be broken apart," he says. "It insulted my intelligence."

Elsewhere, the 2/5/01 *Business Week* article listed among Armstrong's "missteps":

> BOTCHED CUSTOMER SERVICE. *When AT&T moved large corporate customers to its Concert joint venture with British Telecom, many AT&T salespeople quit and service deteriorated. Customers defected, contributing to AT&T's poor financial performance last year....*

- *Institutional Investor – 1/01:*

> Not long ago C. Michael Armstrong was a Wall Street hero, boldly leading AT&T Corp. into the New Economy. In little more than a year, he spent $92 billion to buy two huge cable companies to become the broadband pipe through which the company reached customers.

> *Now Armstrong is under siege ... after warning in May that earnings would slow dramatically, its shares shed 60 percent.*

> *So much for creating value.*

> \* \* \*

> *What an about-face for Armstrong. He spent two years turning AT&T into the largest cable operator in the country. Armstrong's idea was to use cable to deliver phone service, high-speed Internet access and interactive television. Ma Bell's business and long-distance units were supposed to provide strong cash flows until the cable acquisitions paid off. Not so: Long-distance returns are declining even more rapidly than expected, and the growth of the business services unit unexpectedly tailed off after it lost several big customers....*

172.  Jack Grubman, the most influential Wall Street telecommunications analyst, wrote on 10/25/00:

> *Frankly, we do view this restructuring as a reversal of strategy....* AT&T made a big deal about creating an integrated communications company selling bundled services to consumers and business across various distribution channels. That is being abandoned ....

173.  *AT&T stock continued to fall, ultimately to as low as $16-1/2 by 12/00 – its lowest price in years (wiping out $154 billion in market capitalization from the stock's Class Period high) – as AT&T's business problems not only persisted but got worse. In late 00, AT&T halted its equipment purchases for the cable upgrade/broadband build-out, laid off 2,000 cable employees, reduced its estimates of wireless new subscriber growth in 01 and began to try to sell off several of its cable operations.* It was also revealed that the AT&T Wireless unit's "churn" rate was *the worst in the industry,* due to widespread customer dissatisfaction caused by terrible service problems and

huge billing problems and errors. On 1/29/01, AT&T reported horrible 00 operating EPS of just $.88, far below the $2.10-$2.15 forecast during the Class Period, and has indicated to analysts that its 01 EPS will fall even further, to as little as $.20. It was revealed that AT&T's Business Services continued to deteriorate and that its 01 revenues and profits would decline. From the 1stQ 00 through the 4thQ 00, revenues from AT&T's Business Services operations actually declined and AT&T's overall operating EPS plunged in 00 to just $.88 – a sharp decline from AT&T's 99 operating EPS of $1.74. This is shown below:

1999
(in thousands, except EPS)

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $14,117 | $15,752 | $16,333 | $16,398 | $62,600 |
| Business Service Revenues | $ 6,448 | $ 6,764 | $ 7,056 | $ 7,212 | $27,480 |
| Net income | $ 1,076 | $ 1,588 | $ 1,633 | $ 1,153 | $ 5,450 |
| EPS | $.38 | $.49 | $.50 | $.36 | $1.74 |

2000

|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
|---|---|---|---|---|---|
| Revenues | $15,901 | $16,221 | $16,975 | $16,884 | $65,981 |
| Business Service Revenues | $ 7,136 | $ 7,147 | $ 7,108 | $ 7,097 | $28,488 |
| Net income | $ 1,741 | $ 1,745 | $ 1,319 | $(1,700) | $ 3,181 |
| EPS | $.54 | $.53 | $.35 | $(.45) | $.88 |

174.    AT&T's results for 00 were a disaster which has brought the Company to the point of financial collapse. AT&T's financial disaster in 00 resulted in downgrades of AT&T's coveted credit ratings:

•    On 11/10/00, Fitch lowered its ratings of AT&T's senior unsecured debt from AA- to A-.

•    On 11/15/00, Moody's lowered its ratings on AT&T's long-term senior unsecured debt from A2 to A1. Subsidiaries of AT&T (including TCI and MediaOne) also had their ratings reduced.

•    On 11/17/00, Fitch lowered its ratings of AT&T's guaranteed notes from AA- to A+,

- In 11/00, Standard & Poor's downgraded AT&T's debt from AA- to A.

175.   According to the 1/30/01 *New York Times*:

AT&T reported a huge fourth-quarter loss yesterday, burdened by write-offs from its high-speed Internet holdings and the erosion of revenue from long-distance operations.

The company, which plans to split into four operations, also lowered its forecast for the first quarter.

\* \* \*

Accompanying expenses from ballooning debt and other costs associated with AT&T's foray into cable, revenue from the company's consumer long-distance operations continued to decline, falling 14.7 percent, to $4.3 billion, in the quarter. The recent entry of local phone companies into the consumer long-distance business have made the industry far more competitive than it was a few years ago.

"Plainly put, the fourth quarter was lousy ... it's not clear when things will get better," said Kevin Calabrese, a telecommunications analyst at Argus Research.

\* \* \*

The company ended the year with $31.9 billion of short-term debt and $33.1 billion of long-term debt, for a total of $65 billion, *an 81 percent increase from the previous year. Interest expenses nearly doubled in the fourth quarter, to $1.03 billion from $577 million.*

"There is no question that this is an unacceptable level," said Philip Olesen, an executive director of UBS Warburg who analyzes telecommunications debt. "AT&T needs to show investors how it can remove itself from significant debt pressure."

## STATUTORY SAFE HARBOR

176.   The statutory safe harbor provided for forward-looking statements ("FLS") does not apply to the false FLS pleaded. First, the safe harbor does not apply to any of the FLS made as alleged in this Complaint because all those FLS were made in connection with and in furtherance of the AT&T Wireless tracking stock IPO. In any event, none of the particular oral FLS were identified as "forward-looking statements" when made, it was not stated that actual results "could differ materially from those projected," nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the FLS accompany those FLS. The defendants are liable for the false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of AT&T who knew that the FLS was false. None of the historic or present-tense statements made by

defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

177.   This is a class action on behalf of purchasers of AT&T stock between 10/25/99 and 5/1/00 (the "Class Period"), excluding defendants (the "Class"). Class members are so numerous that joinder of them is impracticable.

178.   Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated AT&T's stock price and the extent of and appropriate measure of damages.

179.   Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

180.   Defendants violated §10(b) and Rule 10b-5 by:

(a)   Employing devices, schemes and artifices to defraud;

(b)   Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)   Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of AT&T stock.

181.   Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for AT&T stock.

182.   The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

183.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AT&T stock. Plaintiffs and the Class would not have purchased AT&T stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## PRAYER

WHEREFORE, plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 14, 2001

COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF
PETER S. PEARLMAN

_____

PETER S. PEARLMAN

New Jersey Bar No. PP8416
Park 80 Plaza West One
Saddlebrook, NJ 07663
Telephone: 201/845-9600

Liaison Counsel

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
LAURA M. ANDRACCHIO
FREDERICK B. BURNSIDE


                    WILLIAM S. LERACH

600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

SHEEHAN PHINNEY BASS + GREEN
ALAN CLEVELAND
1000 Elm Street
Manchester, NH  03105
Telephone:  603/627-8149

CAULEY, GELLER, BOWMAN & COATES, LLP
STEVEN E. CAULEY
11311 Arcade Drive, Suite 200
Little Rock, AR  72212
Telephone:  501/312-8500

Attorneys for Plaintiffs

N:\CASES\AT&T4\AT&TConsolAmen.cpt

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California 92101.

2.      That on February 14, 2001, declarant served the CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of February, 2001, at San Diego, California.

Corinne N. Sweat

AT&T IV
Service List - 02/13/01
Page    1


COUNSEL FOR PLAINTIFF(S)

Peter S. Pearlman
COHN LIFLAND PEARLMAN HERRMANN
   & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ   07663
   201/845-9600
   201/845-9423 (fax)


Kenneth A. Elan
LAW OFFICES OF KENNETH A. ELAN
217 Broadway, Suite 404
New York, NY   10007
   212/619-0261
   212/385-2707 (fax)



Steven E. Cauley
CAULEY, GELLER, BOWMAN &
   COATES, LLP
11311 Arcade Drive, Suite 200
Little Rock, AR   72212
   501/312-8500
   501/312-8505 (fax)


Jeffrey S. Nobel
SCHATZ & NOBEL
330 Main Street
Hartford, CT   06106
   860/493-6292
   860/493-6290 (fax)


Marc S. Henzel
LAW OFFICES OF MARC S. HENZEL
210 West Washington Square
Third Floor
Philadelphia, PA   19106-3503
   215/625-9999
   215/440-9475 (fax)


Paul J. Geller
Jonathan M. Stein
CAULEY, GELLER, BOWMAN &
   COATES, LLP
2255 Glades Road, Suite 421A
Boca Raton, FL   33431
   561/750-3000
   561/750-3364 (fax)


Marc A. Topaz
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA   19004
   610/667-7706
   610/667-7056 (fax)


Charles J. Piven
LAW OFFICES OF CHARLES J.
   PIVEN, P.A.
The World Trade Center
401 East Pratt Street, Suite 2525
Baltimore, MD   21202
   410/332-0030
   410/685-1300 (fax)


Joseph J. DePalma
Allyn Z. Lite
LITE DEPALMA GREENBERG &
   RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ   07102-5003
   973/623-3000
   973/623-0858 (fax)


David R. Scott
Neil Rothstein
SCOTT & SCOTT, LLC
108 Norwich Avenue
Colchester, CT   06415
   860/537-3818
   860/537-4432 (fax)


Alan Cleveland
SHEEHAN PHINNEY BASS + GREEN,
   P.A.
1000 Elm Street, P.O. Box 3701
Manchester, NH   03105-3701
   603/668-0300
   603/627-8121 (fax)


Paul M. Weiss
FREED & WEISS LLC
111 West Washington Street
Suite 1331
Chicago, IL   60602
   312/220-0000
   312/220-7777 (fax)

AT&T IV
Service List - 02/13/01
Page    2


COUNSEL FOR PLAINTIFF(S)

Michael M. Rosenbaum
BUDD LARNER GROSS ROSENBAUM
    GREENBERG & SADE, P.C.
150 JFK Parkway
Short Hills, NJ    07078
    973/379-4800
    973/379-7734  (fax)

William J. Pinilis
LAW OFFICES OF WILLIAM J.
    PINILIS
237 South Street
Morristown, NJ    07962


Roy B. Thompson
Amy M. Bogran
ROY B. THOMPSON, P.C.
15938 SW Quarry Road, Suite B-6
Lake Oswego, OR    97035
    503/699-0945
    503/697-6977  (fax)

Roy L. Jacobs
ATTORNEY AT LAW
350 Fifth Avenue, Suite 3000
New York, NY    10118
    212/695-2476

Arthur C. Leahy
Laura M. Andracchio
Frederick B. Burnside
MILBERG WEISS BERSHAD HYNES &
    LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA    92101-5050
    619/231-1058
    619/231-7423  (fax)

John Halebian
WECHSLER HARWOOD HALEBIAN &
    FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY    10022
    212/935-7400
    212/753-3630  (fax)

Gary S. Graifman
KANTROWITZ, GOLDHAMER &
    GRAIFMAN
210 Summit Avenue
Montvale, NJ    07645
    201/391-7000
    201/307-1086  (fax)

Patrick J. Mullaney
ATTORNEY AT LAW
122 West Main Street
Clinton, NJ    08809
    908/735-4288
    908/735-4801 (fax)

James V. Bashian
LAW OFFICES OF JAMES V.
    BASHIAN, P.C.
271 Route 46 West, Suite F-207
Fairfield, NJ    07004
    973/277-6330


Wendy W. Huang
LAW OFFICES OF WENDY W. HUANG
7 Corporate Plaza
Newport Beach, CA    92260
    949/719-7212

Robert M. Roseman
SPECTOR, ROSEMAN & KODROFF,
    P.C.
1818 Market Street, Suite 2500
Philadelphia, PA    19103
    215/496-0300
    215/496-6611  (fax)


Fred Taylor Isquith
Gregory M. Nespole
WOLF HALDENSTEIN ADLER FREEMAN
    & HERZ, LLP
270 Madison Avenue
New York, NY    10016
    212/545-4600
    212/545-4653  (fax)

T&T IV
Service List - 02/13/01
Page   3

COUNSEL FOR PLAINTIFF(S)

Jeffrey Squire
Irving Malchman
Ira M. Press
KIRBY, MCINERNEY & SQUIRE, LLP
830 Third Avenue, 10th Floor
New York, NY  10022
   212/371-6600
   212/751-2540 (fax)

Harvey Greenfield
Laura M. Perrone
LAW OFFICES OF HARVEY
   GREENFIELD
60 East 42nd Street, Suite 2001
New York, NY  10165
   212/949-5500
   212/949-0049 (fax)

COUNSEL FOR DEFENDANTS

Charles W. Douglas
David F. Graham
D. Cameron Findlay
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603
   312/853-7000
   312/853-7036 (fax)

Dennis R. LaFiura
Richard H. Brown
PITNEY, HARDIN, KIPP & SZUCH
   LLP
200 Campus Drive
Florham Park, NJ  07932-0950
   973/966-6300
   973/966-1550 (fax)

Edward R. Barillari
Edward A. Harris
AT&T CORPORATION LAW DIVISION
295 North Maple Avenue
Basking Ridge, NJ  07920
   908/221-4600

George T. Conway, III
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
   212/403-1000
   212/403-2000 (fax)

*